May it please the court, my name is Edward Fitzhugh, and I am the attorney representing the Todechene's in this matter. The court's well aware of the long, tortured history of this case. It started in 2000. During my due diligence this morning or yesterday, reading to see the latest decisions on this subject of tribal court jurisdiction, I was dismayed to learn or to read a recent decision by this court, if I may quote, there is no simple test for determining whether tribal court jurisdiction exists. Tribal jurisdiction cases are not easily encapsulated, nor do they lend themselves to simplified analysis. The Supreme Court itself observed that questions of jurisdiction over Indians in Indian country are complex patchwork of federal, state, and tribal law. I'm quoting from Philip Morse v. King Mountain, issued January 20th of this year. It is plain disposition, slight history on this, is that when the request for hearing in Bonk was submitted, this court remanded it back to the Navajo Supreme Court for its input on the issue, directing that the court focus on the second exception of the Montana decision. The court has been supplied with the ruling of the Navajo Supreme Court and can read in there that the Navajo Supreme Court chose not to limit itself to just the second exception, but also added that the Treaty of 1868 was relevant to these issues. It is plain disposition that the Montana ruling is 30 years old, almost 30 years old, and about that time in the mid-'70s and late-'70s, Congress enacted a number of acts to develop the sovereignty of the Indian nations. They passed the Tribal Court Development Act. They passed the Indian Self-Determination Act, which historically the United States had provided governmental services to the tribes. And through this act, the tribes were now able to contract to provide basic governmental services, law enforcement, health, social services, all the other services that a government is normally expected to supply to its citizens, all as a reflection of Congress's intent to develop the Indian tribes as a limited sovereign. To go back further, the court may be familiar with the different directions that Congress has taken historically regarding the Indians, of assimilation, transition, and now as dependent sovereigns. Are you saying that the Montana test is out the window? Excuse me, Your Honor? Are you saying that Montana is not the law anymore? I am saying, Your Honor, that Montana is almost 30 years old, and many, many things have passed since that time, that Montana, with all due respect to the court, the two exceptions in Montana were not etched in stone. It was more like on a chalkboard. Our bosses at the Supreme Court say it's still the law. It is still the law. Let me interject here on Montana, because I think that there's simply no way for us to say that Montana is no longer good law. The question is what Montana means, but it's still there. We had, at least in one context, a very clear reaffirmation of Montana in the Plains Commerce case. Now, Montana itself deals with two exceptions that would allow tribal jurisdiction, tribal court jurisdiction, over cases involving sea land within the reservation. Those are what those two exceptions are directed to in Montana itself. And that, of course, is what Plains Commerce is also directed to, sea land located within the reservation. The question for us is not that, of course, because we're not talking about sea land. We're talking about tribal court jurisdiction where, to the extent there's any land involved at all, it's a tribal road. But so could you address what this sort of broader meaning of Montana might be outside the context of sea land, which is where those exceptions were originally drawn? Well, Your Honor, even the issue of sea land, in some courts it is arisen to the level of being all-important, and other courts saying no, whether it's sea land or not, is not so important to the issue. Back to Montana, the point I was trying to make, Your Honor, is that the two exceptions in Montana, number one, the consensual conduct is subject to any and every kind of interpretation, just as the second one of the health and welfare of the tribe. They're subject to whatever interpretation a court may wish it to be to arrive at the decision it seeks. How about we stick to the interpretations that are of record in the cases that have decided those exceptions? How do they factor into our analysis of this case? Well, Your Honor, for example, in this case, as plaintiffs would emphasize, here we have almost one of the most fundamental of rights of a tribal government. They purchased these vehicles limited to the use of their own governmental employees who were injured in the course of carrying out their duties inside the reservation. All of these catchphrases and stuff could fit very neatly into the two exceptions of Montana. And yet the court has decided that, no, Montana does not apply. And yet in a prior case the same court decided that Montana did not apply. No, Your Honor. I'm sorry, Your Honor. I said this court has said that Montana does not apply to this case, the exceptions. And yet this same court has ruled that a horse that accidentally wandered on to the reservation gave the tribe jurisdiction over the nonmember owner of that horse. As an automobile accident on a public road, a nontribal road. You're talking McDonald. Yes, Your Honor. Also, other cases such as the Allstate case, I believe, in which receiving of premiums was enough for the court to find – receiving of premiums from members living on the It is our contention, Your Honor, and as stated in the Navajo Supreme Court, that in reality isn't Montana, in a sense, especially the first exception, isn't it a minimum contacts test that would be applicable? And as I read earlier, where this issue is just not subject to being able to be pinned down, arguably it's because the two exceptions in Montana are open to so much interpretation. Better not – wouldn't it be better to have the minimum contacts standard that we are all familiar with, that we are all familiar with, that can be applied? Counsel, may I ask you – you talked about the case where the horse was involved in the traffic accident. And in that case, I thought that we focused on the nature of the land, the fact that the land was owned by the tribe. But in our bonk opinion in Smith, it seemed that we lessened the impact of the ownership of the land  So how do you deal with that language in Smith that now seems to suggest that we look at that as only one factor? Of course, Your Honor. And it is – it should be only one factor. Just as in a minimum contacts analysis, there are multiple factors that take – that are taken into consideration to arrive at a decision of whether the court has jurisdiction. Added to this – Is there any court other than the tribal court that has looked at this case as analogous to a minimum contacts or due process issue? They have not stated specifically where we are going to apply a due process or minimum contacts standard to it. But there has been terminology similar to what you would find in a minimum contacts case issue. What's your strongest case that's analogous to a minimum contacts approach? What's the very strongest case you have that takes that approach? Are you asking me historically as a Federal cases or cases involving the University? You said there are cases that have had that type of discussion. I'm asking you what's the clearest case that you have that is analogous to a minimum contacts analysis? Well, they're the ones that we've – Give me your single strongest one. The ones we've read about in law school. Hansen v. Dekla, the Burger King case, the – I mean a tribal – when determining tribal jurisdiction. Well, Your Honor, there it is. As I said earlier, a horse wandering onto the reservation, they find that sufficient contact to find jurisdiction. In this case where plaintiffs have listed a laundry list of continued and long-term contacts – Based on the status of the land as being tribal land. Well, and – Could you describe what land was at issue? What was the highway in McDonald? Was that a tribal-owned road or was that a publicly non-tribal-owned land? It was a – It was not a tribal road. I don't believe it was a tribal road, Your Honor. That's correct. It was treated as analogous to a tribal road even though there was a right-of-way. The focus was on the status of the land. The focus, Your Honor, was that – or in conclusion, is that the tribe had a very strong interest in protecting the safety of its roadways. Here, a horse wandering loose on a roadway, which gave it jurisdiction to a nonmember that did not live on the reservation. Contrast that to, as I said in the record, the long list of contacts – deliberate contacts that Ford has had with the Navajo Nation over a long period of time. What we would add to this, Your Honor, is just one last thing, is that of the warranties that was brought up in the Navajo Supreme Court, the Navajos have adopted the uniform – portions of the Uniform Commercial Code, Section 2, on warranties in which Officer Totichini would have been one of those protected under the warranties of this vehicle. And so all of this goes into the foreseeability of Ford defending in tribal court, where they knew they were – it was a tribal employee that was driving the vehicle. Thank you. Thank you. I'd like to hear from the tribe's counsel, please. We'll give you five minutes. Actually, you have less than that, but we'll round it up to five. Do I get a few minutes for a rebuttal? We'll see how that goes. All right. I'll be brief. Good morning, Your Honors. Good morning. Before you start, could we put five minutes on the clock, please? Thank you. Thank you, Your Honor. Rather than – Could we get your name again for the record? Oh, yes. My name is Luralene Tapahi, and I'm representing the Navajo Nation here. I'm an attorney with the Navajo Nation Department of Justice. Rather than giving my statement that I had prepared, I would rather address some of the issues that the Justices touched upon in Mr. Fitzhugh's presentation. I think that the case that best supports the minimum contacts and the personal jurisdiction analysis that both of us are attempting to apply here to the tribe's assertion of jurisdiction, I think that's the Plains case itself. If you take a look at how Justice Roberts analyzed the contacts and the nexus issue with respect to the Longs case and looked at what kind of contacts the bank had had with the tribal members, with the tribe itself, I mean, if you look at that, you can see that he looks at the question of whether it would be fair to expect the non-Indian bank to be hauled into tribal court. There's also another case under this circuit, the Salish Kootenai case. That's a very good analysis by this Court of the personal jurisdiction and minimum contacts analysis. So I think that rather than spend too much time on that, I think it's pretty well established that the facts of this case, if we were dealing with a state court attempting to adjudicate a products liability claim against Ford, that the facts would definitely satisfy the minimum contacts test. And, in fact, in their brief, Ford Motor Company actually concedes this point on page 15 of their brief. The fact that a state court would have subject matter jurisdiction under similar facts, does patterns, does not demonstrate that the tribal court has jurisdiction. So I think they understand that if we were dealing with the state court here, that the minimum contacts analysis would fit in the state court. Also, do I understand you correctly, then, that your view under the state of the law, your view of Montana as it exists is that the tribal court can exercise jurisdiction over any non-Indian involved in a run-of-the-mill tort claim? Well, I'll address that as I get to my next point, which is following on what I said here. If we look at this as a state court jurisdiction case, we know that minimum contacts are satisfied and the court would have jurisdiction. Now, Montana comes in because of a simple fact, that this is an Indian tribe. It's a bit bittersweet for me to be here. I'm very honored to be before this court as a tribal member, as a tribal attorney, and as a person who's been a resident of the reservation for many years. However, it's bittersweet because we're essentially, I'm representing the tribe in the court of the conqueror. And so Montana was developed because the conquering societies have always, through history, have always struggled with that question of, what do we want to leave to that conquered society? What institutions, what political powers do we want to leave them with? Now, in the case of Indian tribes, Montana has been developed to answer those difficult questions. And in the case of the Navajo Nation, we know that Congress has supported the tribal court system. As early as the 1930s, Congress established the BIA courts, which then morphed into the tribal courts. Tribal courts have been set up for many, many decades. The Indian Tribal Justice Act was enacted, and Congress routinely funds, provides lots of funding for tribal courts. And clearly, that is something that the Congress, that the federal government views as very, very important for tribal societies to maintain as their separate political bodies. So I think that Montana is clearly the rule. And there's that notion that, you know, if tribes are going to act like state governments, which the Navajo Nation has attempted to do here by enacting a long-arm statute that's the same as a state statute, by engaging in the same due process and minimum contacts analysis, if the tribe is going to act like a state government over non-Indians, then we need to decide whether the exercise of that authority over the non-Indian is fair and is something that we will allow. So I do believe that Montana is the rule, but I also firmly believe that both tests under the Montana analysis, the consensual relationship test and the tribal self-government test, have been fully satisfied in this case because you have a company that has purposefully availed itself, has entered into a contract directly with the tribe, and this notion that the inability of the Navajo Nation to adjudicate this case would have to have catastrophic consequences for the tribe. I mean, what does that mean? In the Plains Commerce case, that was simply Justice Roberts mentioning one commentator who used the word catastrophic. If we... But aren't we bound by that language? Well, Your Honor, let's assume that from now on, if there was, let's say, a taxation, a regulatory taxation law of some sort, let's say that the non-Indian now wanted to use the Plains Commerce case and say, if they cannot tax us as a business or if they cannot tax our oil and gas severance from the reservation, it's not catastrophic to them. The non-Indian company could simply use this notion of this catastrophic consequences to invalidate tribal taxation across the board. It would overrule the Colville case, the Marion case. Well, I'm assuming that the tribe would have a response to that. If you don't have revenue, then the tribe couldn't exist. So to me, that would be a different scenario. Well, the non-Indian would simply answer by saying, well, the federal government financially supports tribes, gives them millions of dollars a year for their social programs. I see you. Lots of tribes... Finish your sentence, and then I have one question. You're out of... Lots of tribes also have casinos to financially support themselves. So, I mean, it's really difficult to know what catastrophic means. And I think that we should be cognizant of the fact that this was a 5-4 decision. And also that... Yeah, but it's the five that count. Yes, I understand. But that just shows that it's very difficult to have a straight line and to have everyone on the same page with respect to these issues. And so, I mean, I think that here we have a very clear minimum contacts case. And the Navajo Nation courts deserve the chance to be treated like any other state court. Thank you. Thank you, Your Honor. For Ford? Thank you, Your Honor. Richard A. Darabin for Ford Motor Company. Could you speak up a little, please? Yeah. Richard A. Darabin for Ford Motor Company, Your Honors. Thank you very much. The question in this case is not how tribal courts apply to members of the tribe, but how tribal court jurisdiction applies to nonmembers of the tribe, such as Ford. That's the basic question. What we heard before was that the tribe should be allowed to regulate their own members' conduct, with which we don't disagree. But the King Mountain case says that for the second exception to apply, the outsider's conduct has to have a direct threat to tribal sovereignty. And in the Strait case, which is a Supreme Court case, they say that generalized harm to tribal members is insufficient to meet the second test. Let me ask you this, and I'm not describing the facts of this case, so this is a hypothetical. Let's assume that some evil car company, which Ford is not, but let's assume that some evil car company seeks to impair the law enforcement capacity of an Indian tribe. Maybe it seeks to do so because it hopes to do bad things upon the reservation once the law enforcement capacity is diminished. And it sends onto the reservation, pursuant to a contract, a fleet of automobiles that is designed to malfunction in catastrophic ways and to kill large numbers of the police force. If that happens, is this evil car company, which is not Ford, I'm not after you guys on that, is that evil car company subject to tribal court jurisdiction? Well, I think under the Montana test it could be because you're describing conduct that could have a catastrophic effect on the tribe's ability to govern itself. You're also describing two things that aren't present here. One is deliberate conduct, which there's no allegation of here. Second, you're also saying ---- Well, that may or may not be, depending on how you conceive of a product liability case, clearly Ford deliberately designed the car. Well, what you're saying here, though, also is there's two points I want to make about the Ford design that I think are important to the analysis when we get to the tribal land issue. Number one is you say that Ford sold the car or, in your hypothetical, sold the car to the tribe. Of course, that's not what happened here. Ford sold to a dealer in New Mexico. The dealer in New Mexico, which is not Ford-owned, then entered into a separate contract with the tribe. Also here, you have to keep in mind that the defect that's alleged is not any defect that caused the accident itself. The defect alleged, and this is plain in the complaint, it was plain in the proceedings before Judge Rosenglad on the preliminary injunction, and it's commented on in the Navajo Supreme Court opinion, is a failure of a seat belt. And the seat belt would only cause an enhanced injury, i.e., the injury that wouldn't have occurred if the seat belt had worked well during the accident. So the tribal land part here is simply not implicated by the defect that's alleged. In other words, the cases say that tribal land is only one factor to look at, but then the King Mountain case says, and the other case say, you look at the relationship between the land and the claim. And so, for example, if there's a claim that outside conduct is somehow affecting land, then the land may take an elevated status in terms of the jurisdictional analysis. But here, the land had no effect on the claim, because the claim is that the seat belt is what was defective and what failed. And so the argument is, listen, whether this accident happened on a tribal road or a public road or an I-5, the same thing would have happened. Exactly. And that's why you don't have any direct threat to tribal sovereignty, because it really doesn't affect the ability of the tribe to – and as a result wouldn't be different in a state court or a federal court or a tribal court, because the harm doesn't in any way peculiarly affect the tribe. It's simply an accident of a common nature, which is something that doesn't come within this Montana exception. Let me ask you this, if I can. The language in the Plains Commerce case that talks about catastrophic with respect to the Montana exception is, it seems to me, a tightening of the exception. I'll say it this way. It makes it quite clear that the exception is not going to be very widely available, but I'm trying to figure out the context in which that's written and what that might mean. The court is very clear, beginning with the introduction, that we're talking about fee land within the reservation. So we're back to core Montana. The exceptions were originally written in Montana with respect to fee land. Correct. Are we supposed to read that catastrophic language in the Plains Commerce case solely with respect to fee land,  I think it goes beyond the case for this reason, because it's true that Montana was a fee land case, and it's true that Sprate was a right-of-way case. And it's true, of course, that Plains Commerce is a fee case. And then Hicks, of course, was a tribal reservation case. What those cases all say is that Montana applies regardless of the nature of the land, and what has sharpened and become narrower as the cases have been decided is the idea that the land is only one thing to look at and one factor, and then you judge the land in relation to the claim being made. Whereas before, in fact, this Court's Hinshaw opinion, which the Navajo Supreme Court cited, and the McDonald case, to a certain extent, elevated land status to almost a dispositive nature. And I think that the courts have gone away from that presumption that land status is a turning point for these cases. Let me ask you this. It's clearly above our pay grade to rewrite Montana. I mean, it is what it is. Is it time for the United States Supreme Court to revisit Montana? I mean, I struggle with Montana. We all struggle with Montana. There's a lot of ambiguity. There's a lot of – I mean, at some point, the Court revisits certain areas of the law and reconceptualizes. Are we there yet with Montana so the Supreme Court should revisit? Well, I don't think so. But I will tell you that when you read the Navajo Supreme Court opinion, particularly the last two paragraphs, that Court is basically saying that the U.S. Supreme Court took a wrong turn starting with Montana. It has gone further off the tracks in the last 30 years. And so I think what the Navajo Supreme Court is saying, basically, to the U.S. Supreme Court or perhaps to Congress, is the Supreme Court, in the tribe's view, has made a mess of tribal court jurisdiction and somebody needs to fix it. I think that's what the Navajo Supreme Court is saying. But that, to me, that's really a congressional – I'm struggling for the right word – a congressional, you know, their choice to do it. Because under Indian tribal law, a congressional statute can confer jurisdiction if the Congress wants to pass one. So Congress could fix the Montana line of cases easily simply by passing a statute if that's something Congress wants to do. Although the Supreme Court seems to be quite willing, as Montana and the later cases indicate, to proceed without benefit of clergy. That is to say, it doesn't seem to think it needs changes in the statute to keep rearranging a little bit. Well, sure. The Supreme Court could change Montana if it wanted to. But I get the sense from reading the more recent opinions, particularly Plains Commerce, that they're not planning to change Montana. They're planning to narrow it. In fact, in the Plains Commerce case, Justice Roberts quoted, I think, at least three times Justice Souter's concurrence in the Hicks case, in which Justice Souter said, really, the only thing that's important is the member status of the unconsenting party. And that was Justice Souter's view in Hicks, that if the unconsenting party is a nonmember of the tribe, the presumption is that jurisdiction does not exist. And I think that's pretty much become the law of this circuit with Smith v. Salish, which really turned on the fact that the nonmember was a plaintiff as opposed to a defendant. And whether it's a presumption or whether it's just it's unusual, you can apply different words to it, but I think that's right. I mean, a tribe cannot easily subject a nonmember to jurisdiction in the tribal court. How do you deal with McDonald, though? McDonald? Is that case wrong? Well, I think McDonald, A, it's wrong because it basically makes land status determinative. By the way, in McDonald, it was called a BIA road in the opinion, and Justice Brown or Judge Browning says later in the opinion that we conclude that the BIA road is reserved from the rule in straight. So I take McDonald. I see. So I stand corrected then on that point. Okay. I take McDonald to mean that it's equivalent of tribal trust land in McDonald. Okay. I stand corrected. But in McDonald, the defendant in McDonald had the power to control the horse that got on and caused the accident on the tribal road. In this case, Ford did not have the power to control where Gurley Motors, who was the Gallup New Mexico dealer that sold it, where these expeditions would go. The tribe did not set any conditions on entry. In fact, it was the tribe itself that brought the expeditions onto tribal land. And as we talked about earlier in this discussion, the alleged defect didn't cause the accident in the same way the horse caused the accident in McDonald v. Means.  Would that make a difference jurisdictionally? I think it does, and I think it does. So if this Ford Explorer flipped over because of a defective axle, for example, are you suggesting that the tribal court would have jurisdiction then? No. I would still assert that Ford doesn't have jurisdiction, but I would say that the tribe would have or the tribe and the Tonishis have a slightly better argument because of language in cases like Smith and King Mountain where you look at the relation between tribal land and the claim. I mean, it seems to me if we're going to write an opinion, we ought to be prepared to say either that as a general proposition under Montana, ordinary negligent torts cannot be brought against non-Indians in tribal court. Well, I would agree with that proposition. But you're suggesting it seems like you have to kind of look at the sort of negligence to make that determination as opposed to Judge Fletcher's hypothetical where there's intentional wrongdoing aimed at the tribe itself. No, what I'm trying to say is that in the case of the broken axle, the argument that there's some relation between the land status and the defect that caused the harm is somewhat closer, but I don't think it's close enough to get there because of the stringency of the second test, which is there's no direct threat to tribal sovereignty. Straight says harm to members is insufficient. It's really just a tort action for damages that doesn't affect tribal sovereignty, period. How can you say it doesn't affect tribal sovereignty? I understand that may not be the test, but how can you say it doesn't affect tribal sovereignty when we're talking about death of a tribal law enforcement officer? It's different from a Ford vehicle sold to a private person living on the reservation, tribal member going about his or her business, going to the grocery store, and so on. This is the exercise of sovereign power, law enforcement. So how can you say it doesn't affect the sovereignty of the tribe? Well, I don't think the fact that Ms. Totoshini was a tribal policewoman has an effect on the ability of the tribe to govern itself. And that's really what the second exception goes to. It goes to the ability of the tribe to govern itself and to make its own rules. That's what the court is talking about. My problem, I guess, is with your word affect. It clearly affects. How strongly affect is or how strongly affect must be, that's a different question. But if you're going to shoot, again, Ford Motor Company didn't do that. But if you're going to shoot a tribal law enforcement officer, that seems to me that that affects the tribal sovereignty. Similarly, if the tribal officer dies because of some product defect, which is the allegation in the case, that affects. Now, it may not affect it enough to subject your client to jurisdiction. Well, I think we're using sovereignty in different ways. I think you're using sovereignty to mean that anyone who happens to be an employee of the tribal government. Performing a traditional sovereign function. Enforcement of the law of the sovereign. Yes, but I don't think an accident, even though it injures or kills a tribal policewoman, interferes in the sense that we're talking about. It's not like someone is trying to prevent them deliberately from doing their duties under law or someone's trying to bribe them to get a better result from the tribal government. Something like that, I think, may have a more direct effect on tribal sovereignty. Counsel, may I ask you a procedural question? If you were to prevail, how would this case proceed? Would it be remanded? Would the Navajo court's decision be reversed? Procedurally, how do you visualize this case going forward? This is an appeal from a preliminary injunction. And Judge Rosenblatt of the District Court of Arizona granted a preliminary injunction to prevent the tribal court from proceeding. I suppose, theoretically, it would go back to Judge Rosenblatt to decide whether to make the injunction permanent or not. And it seems to me that the jurisdictional facts are undisputed, and that this Court could send a remand order to Judge Rosenblatt to say that the preliminary injunction should become permanent, because based upon the record that was developed in the tribal trial court, there are no jurisdictional facts that would allow the case to go back for any further hearing. And they can sue you in either district court or superior court? In either Arizona or Utah. This accident occurred actually on the Utah portion of the Navajo Reservation, so theoretically Ford would be subject to suit in either of those cases. And do you have any statute of limitations defenses in either the Federal District Court or in either of the two state courts? I have not researched that, Your Honor. Oh. So far as we know, we might send it back, but then it gets dismissed on statute of limitations grounds? I don't know if that argument exists. I certainly the plaintiffs would argue that the statute's been told the entire time they've been involved in these proceedings. And I don't know the answer. And was the case filed in Federal District Court within the period of statute of limitations? Well, they never filed it in district court. Yeah. The personal injury case was filed in tribal court. I see. So the only thing the only proceeding we have is the injunction sought in Federal District Court against the proceeding. Yeah. After the district court refused to dismiss based on jurisdictional grounds, Ford then filed a separate Federal court action in district court for an injunction. I see. That's the only thing that's pending in court. So as I understand it, then, you're reserving the right to defend on the ground of statute of limitations if we say that the tribal court didn't have jurisdiction and that the suit, if it can go forward, if at all, in either Federal or state court. Well, as I think Judge Silverman said before, that's a decision that's above my pay grade. Because I'm not involved in the personal injury case. But I presume that that, if that defense is out there, I presume Ford would consider raising it. Well, you'd have whatever defenses you have, including that the seat belt isn't defective or whatever. It is what it is. I see you're out of time. So thank you very much. Mr. Fitzhugh and Ms. Tapahi, if you would take one minute each. Mr. Fitzhugh, will you go first? Ms. Tapahi, would you keep it to a minute, and then we'll turn the podium over to Ms. Tapahi. One matter for the Court to consider is that, first of all, Ford was the one that the entity that sold these vehicles to the Navajo Nation. During an evidentiary hearing, the Director of Purchasing testified that he dealt over the phone with representatives of Ford regarding the sale. This Gurley Motors was only the repository that received the vehicles and then turned them over to the Navajo Nation. But Ford sold those vehicles to the Navajo Nation. Ford Motor Credit, its subsidiary, financed that. Now, if Ford Motor Credit, if Ford Motor Company directly sold that vehicle to Officer Totichini, and if Ford Motor Credit directly financed that vehicle to Officer Totichini and we had that accident, there would be no dispute that the Navajo Tribal Court would have jurisdiction over such a case. They sold the vehicles to the Navajo Nation. Navajo Nation is an entity. They knew its employees would be driving that vehicle. Do I understand? I want to just make sure I follow what you would have us do. If you win today, we would reverse the preliminary injunction, and Judge Rosenblatt would have to let your case go forward in tribal court. It would go forward in tribal court. If we disagree with you, then we would affirm the preliminary injunction, and then whoever wants to go back to Judge Rosenblatt for further proceedings can do that. Is that right? Is that how this would work? That's my understanding, Your Honor. Let me ask you one final thing. Is there any reason why you can't sue these folks in a court that indisputably has jurisdiction? You started off by telling us how tricky this jurisdictional question is, and I'm sort of puzzled why you started the case in this quagmire instead of going to courts where you could clearly have your day in court. Well, if they would have told me nine years ago about this quagmire, Your Honor, I wouldn't have done it. But as it got started, then, you know, you don't let go. You proceed, and the Navajo Nation has its own interest in this case, too. Yeah, but you don't represent them. No, Your Honor, but it's an issue that I believe very strongly in personally, and that if there is going to be this development of Congress's intent to develop these courts, it has to be done. Navajo Nation now has its own bar exam. It has its own bar association. There's a Hopi that was a professor and assistant dean at ASU. Someday these cases are going to naturally be before the tribal courts. It has to start, and so why not now? Defendants have their recourse if they are denied due process by going through the appellate system of the tribal court and then going to Federal court. Thank you. Thank you, Mr. Fitzhugh. Ms. Tapahi, a minute. Thank you. I wonder if anyone in this room has ever purchased a vehicle directly from a manufacturer, from Toyota, from GM in Detroit. It doesn't happen because these manufacturers deal through their dealerships. You have to go through the dealership to get a vehicle as a consumer or even as a tribal government or a state municipality. You have to go through the dealership. So I think that the point is that Ford Motor Company conducted itself directly with the Navajo Nation government, and we're not talking about just any tribal member here. We're talking about a government employee of the highest order, a police officer, and if we have a situation where this situation occurs and the Navajo Nation has no ability to exercise its authority over these, either whether they're negligent or intentional torts, then you have a very serious impairment of the tribe's sovereignty, of the tribe's self-government interest. I think that there's a serious question whether there might be an ability to even bring such a case in a state court. If I'm a state court in Utah, I'm going to look at the Williams v. Lee test. I'm going to look at how adjudication of this matter in a state court would possibly impinge on the Navajo Nation's right to adjudicate it in their own courts. So I think the question of whether there's concurrent jurisdiction in the state court or exclusive jurisdiction in the state court is really unanswered and is unclear. Okay. Thank you so much. And thank you to all counsel. The case to start, you just submitted.
judges: Silverman, W Fletcher, Rawlinson